LAW OFFICE OF
## JESSE M. SIEGEL
The Woolworth Building
233 Broadway, Suite 2701
New York, New York 10279

Jesse M. Siegel
Linda A. Burns

Tel (212) 207-9009
Fax (212) 732-1339

July 13, 2010

**BY ECF**

Hon. Kimba M. Wood, District Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      *United States v. Shapiro, et al.,* 06 Cr. 357 (KMW)

Dear Judge Wood:

  The following document, in letter format, constitutes the reply of our client, William B. Foster, to the government's sentencing memorandum in the above-captioned case. This cover is being filed along with the reply pursuant to the ECF rules for the Southern District of New York.

  Thank you for your attention.

            Very truly yours,

             /s/
            Jesse M. Siegel

LAW OFFICE OF
## JESSE M. SIEGEL
The Woolworth Building
233 Broadway, Suite 2701
New York, New York 10279

Jesse M. Siegel
Linda A. Burns

Tel (212) 207-9009
Fax (212) 732-1339

July 13, 2010

**BY ECF**

Hon. Kimba M. Wood, District Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

*United States v. Shapiro, et al,* 06 Cr. 357 (KMW).

Dear Judge Wood:

As counsel to William B. Foster, a defendant in the above matter, we write in reply to the government's sentencing memorandum, submitted July 2, 2010 ("Gov't Memo"). Thank you for giving us this opportunity by adjourning sentencing from July 7th to July 26th at 2:00 p.m.

While the government understandably argues for a "substantial term of imprisonment that will provide for just punishment and accomplish the other factors set forth in Title 18 United States Code, Section 3553(a)," (Gov't Memo at 3), we respectfully submit their analysis addresses only punishment, fails to engage in the balancing of other factors required by section 3553, and does not establish that a substantial term of imprisonment is not "greater than necessary" to achieve the various purposes of sentencing, given Mr. Foster's unique situation.

Moreover, the government's overall analysis is flawed because of two fundamental, related errors: first, the government assumes that everything bad that happened at Cobalt was part of a master "scheme," planned from the start and agreed to by Mark Shapiro, Irving Stitsky and Mr. Foster; and, second, the government fails to distinguish meaningfully between Shapiro and Stitsky, on one hand, and Mr. Foster. This colors the government's analysis of Mr. Foster's role in the offenses and the applicability of sentencing enhancements for a leadership role and sophisticated means, and virtually guarantees they would argue a substantial term of imprisonment is required.

Hon. Kimba M. Wood
July 13, 2010
Page 2

In the government's view, Cobalt was always intended- by Shapiro, Stitsky *and Mr. Foster*- to be nothing but a scam, designed to solicit money from investors by false pretenses and then steal it. The government assumes it was always the plan that Shapiro would actually run Cobalt, Stitsky would both be in charge of the sales force and actively engage in sales, and that Mr. Foster would serve merely as a figurehead, allowing the roles of Shapiro and Stitsky to remain hidden from investors. Thus, the government argues that one of the things Mr. Foster did right from the beginning was knowingly deceive the company's lawyers in order to get their approval for leaving Shapiro and Stitsky out of the PPMs or misrepresenting their roles when they were disclosed. (Gov't Memo at 25.) The government assumes it was part of the agreed-upon plan that Shapiro, Stitsky, and the sales force under their control, would repeatedly lie to potential and actual investors and create false advertising, and that the three would then steal the money, by misusing company credit cards and taking excessive fees.

We do not argue that the government's view is unreasonable or generally inconsistent with the evidence. The government proved at trial that the PPMs failed to disclose the roles of Shapiro and Stitsky- first, at all, and then, accurately- and that this constituted a fraud on investors; that Shapiro and Stitsky, in particular, overtly lied to investors; that some of the company's advertising was false; that Shapiro misused the company's credit cards; and that Shapiro directed that excessive fees be taken from investors' money, some of which flowed to Mr. Foster. We disagree, however, that everything that occurred at Cobalt was planned and part of an overall agreement, and, thus, equally attributable to all three defendants. While the government's overall view is not inconsistent with the evidence, neither is it established by the evidence. The government takes a number of things that happened over a period of time and synthesizes them in one way out of many possible ways, which has the effect of simplifying them, and, as at trial, making for an effective presentation in a conspiracy case. We respectfully suggest, however, that reality, as usual, is, and was, far more complicated.

Things happened very quickly at Cobalt. In barely three years, it went from being a start-up company with one office, no property, few resources, and only a couple of employees, to a company with offices in Springfield, Great Neck, Miami, and Houston, almost 200 employees, including a staff of accountants and other professionals, several properties purchased and under development and more being planned, and millions of dollars in investor funds. Whatever Shapiro and Stitsky may have intended, and even acknowledging the improprieties that occurred, it is not unreasonable for Mr. Foster to say that, as far as he was concerned, this was an actual company that he hoped and expected would return a profit to its investors, and not just one big scam.

The government may very well be correct that, right from the beginning, Shapiro and Stitsky planned to defraud investors by hiding their true roles at Cobalt, and that they needed a "front man" to do it. They, after all, had both previously been convicted of financial fraud, and had gotten to know each other while incarcerated. They certainly had ample time and opportunity to come up with such a plan. However, the government fails to consider the possibility that Mr. Foster was not "in" on the original plan, and was duped by two very experienced and talented conmen, at least initially, into believing their respective roles at Cobalt would be the ones first described to the attorneys.

Hon. Kimba M. Wood
July 13, 2010
Page 3

Nonetheless, we do not argue that Mr. Foster is blameless. Whether it was the way it was originally planned by Shapiro and Stitsky, or due to Shapiro's inability to resist taking over, or simply the way things evolved, it is certainly true that Shapiro quickly asserted control over all aspects of Cobalt and that Stitsky went beyond simply setting up and training its sales force to running it and actively selling shares in Cobalt himself. The failure to reveal their true roles constituted a fraud on investors in which Mr. Foster participated, a fact for which he is genuinely remorseful. Indeed, the government was almost correct when it argued at trial that the "scheme" could not have succeeded without Mr. Foster's participation; our only disagreement is that, unlike the roles played by Shapiro and Stitsky, keeping their roles hidden required having *someone* else to call the President and CEO, but not that this be Mr. Foster. The fraud would not have existed without Shapiro, and Stitsky played a major, active role, with Shapiro, in most of the fraudulent sales tactics; but Mr. Foster was replaceable. If Shapiro and Stitsky never intended Cobalt to be a real company, but simply a means to fleece investors, it seems unlikely they would have been deterred if Mr. Foster had not gotten involved; they could have found a different "figurehead."

The government's failure to distinguish between Mr. Foster and Shapiro and Stitsky is illustrated by their discussion of the investment money returned to investor Aimar Donteville. (Gov't Memo at 5, 26, 42.) Equating Mr. Foster's conduct with instances where Shapiro and Stitsky overtly lied to potential investors, the government points to Mr. Foster arranging for Donteville to get his investment back after Donteville sent a threatening letter as an example of "steps that the defendants took in furtherance of the scheme to defraud." (Gov't Memo at 5.) While, on its face, the incident could be seen as an effort to protect the "scheme" from being exposed, as the government urges, it just as easily could be understood as an attempt to avoid an unnecessary situation, whether or not Donteville had a legitimate claim. In fact, Donteville had been a client of a Cobalt employee named Lisa Arden, who was subsequently fired.

The government also repeats several arguments it made at trial with which we continue to disagree, and introduces interview notes from witnesses it chose not to call at trial[1], in an effort to portray Mr. Foster as having played a larger role in the frauds committed at Cobalt than was established by the evidence. The government notes that financial statements from Shapiro's Vail Mountain Trust falsely claiming it had $3 million in assets were found on Mr. Foster's computer. (Gov't Memo at 6.) The statements were signed by trustee Robert Cohen, Esq., and there was no evidence that Mr. Foster prepared the statements or knew the information in them was false.

The government states the charts it introduced at trial showed how, "at the direction of Foster and Shapiro," excess fees were transferred into their personal trusts or "how the money was used to pay for certain luxury items on behalf of the defendants." (Gov't Memo at 7.) Kim McPherson, the bookkeeper, testified it was Shapiro who directed her to transfer the excess fees

---

[1] We submit the Court should not credit the FBI 302 statements of witnesses the government chose not to call at trial and expose to cross-examination. The 302s are double hearsay- agents' statements about what witnesses said to them- and the government has provided the Court with no reason to find them reliable.

Hon. Kimba M. Wood
July 13, 2010
Page 4

into the partnership entity from which Mr. Foster and he received their fees, and the charts showed how the money was used to purchase luxury items on behalf of Shapiro, not Mr. Foster.

As at trial, the government again relies on a letter purportedly addressed to outside lawyers for the purpose of obtaining an opinion letter permitting Stitsky to work at Cobalt. (Gov't Memo at 39-40.) The letter, although over Mr. Foster's signature block, was not on letterhead and not signed, and there was no evidence it was sent by Cobalt or received by its addressee, whose documents were obtained by the government. The Court was correct not to admit the letter into evidence at trial.

While acknowledging his "health issues," (Gov't Memo at 44), the government fails to consider the way Mr. Foster's quickly deteriorating health contributed to his involvement in the offenses. As we discussed in our original submission, Mr. Foster was diagnosed with COPD around the time he first became involved with Cobalt. It limited his energy and ability to travel from Springfield. Had he not been so ill, Mr. Foster might have been better able to resist Shapiro taking over, and might have been able to provide oversight of the sales force. Instead, he concentrated on administrative matters at the Springfield office. Even there, however, his poor health no doubt impacted his ability to be effective, given everything that was happening so quickly at Cobalt.

The government argues that "a substantial sentence is necessary to deter others who, like Foster, are involved in boiler-room-type real estate private offering schemes," (Gov't Memo at 45), and that the various ways they contend he participated in the fraud "all weigh in favour of a sentence of a significant term of imprisonment that will provide just punishment for the offense and accomplish the other factors set forth in Title 18 United States Code, Section 3553(a)." (Gov't Memo at 46). However, they do not address why a significant term of imprisonment is "not greater than necessary" to accomplish the purposes of sentencing, given Mr. Foster's unique situation. In particular, the government does not address why the purposes of sentencing would not be accomplished through a term of probation, with or without an extended period of home detention.[2] The latter would impose a significant punishment while at the same time accounting for Mr. Foster's medical needs.

We are aware, of course, that the Court imposed a term of imprisonment of 85 years on Stitsky on July 6th. Mr. Foster is not Stitsky (or Shapiro, for that matter). While we ordered the minutes of Stitsky's sentencing hearing, we have not yet received them. Nonetheless, we are certain the Court imposed such a lengthy sentence on Stitsky, at least in part, to protect the public by ensuring that he is never again in a position to repeat the type of predatory fraudulent activity he engaged in both prior to and during his time at Cobalt. Here, as discussed in our original memorandum, the Court need not have the same concern about Mr. Foster, and the government does not even urge it as a basis for seeking a substantial term of incarceration.

In response to our sentencing arguments regarding Mr. Foster's medical condition, the

---

[2] Pursuant to U.S.S.G. section 5C1.1(c)(3), if the Court imposes a sentence of probation, it may include home detention as a condition.

government provided our memorandum and his records to the Bureau of Prisons, which "has confirmed that it is well-equipped to provide all medical treatment to Foster." (Gov't Memo at 44.) It would be surprising if the BOP did not claim it was able to provide proper medical treatment for Mr. Foster. Unfortunately, the reality is that Mr. Foster would be far more likely to contract the type of respiratory ailment which could prove fatal to him in prison than out, and far less likely to receive appropriate treatment for both his general ongoing needs and in case of such a life-threatening illness.

We are attaching hereto, as **Exhibit A**, an article entitled "Health Care in the Federal Prisons: Fact of Fiction," which appeared in the Californian Journal of Health Promotion. Daniel S. Murphy, *Health Care in the Federal Bureau of Prisons: Fact or Fiction*, California Journal of Health Promotion , Vol. 3, Issue 2, 2005, at 23. In addition to providing substantial anecdotal evidence from inmates, the author, a former federal inmate now at Appalachian State University, quotes a 1994 report from the United States General Accounting Office, which stated:

> Inmates with special needs, including women, psychiatric patients, and *patients with chronic illnesses*, were not receiving all of the health care they needed at the three medical referral centers we visited [Butner, North Carolina; Lexington, Kentucky; Springfield, Missouri]. This situation was occurring because there were insufficient numbers of physicians and nursing staff to perform required clinical and other related tasks ... As a result, some patients' conditions were not improving and others were at risk of serious deterioration.

*Id*. at 26-27 (Journal pagination) (emphasis added).

To the objection that conditions might have improved since the GAO report of 1994, we are also attaching, as **Exhibit B**, a copy of an article appearing in the April, 2009, issue of the American Journal of Public Health, entitled, "The Health and Health Care of US Prisoners: Results of a Nationwide Survey." Andrew P. Wilper, MD, MPH, et al., *The Health and Health Care of US Prisoners: Results of a Nationwide Survey,* American Journal of Public Health, Vol. 99, No. 4, April 2009, at 666 (journal pagination). The authors "analyzed the prevalence of chronic illnesses, including mental illness, and access to health care among US inmates," and concluded, "Many inmates with a serious chronic physical illness fail to receive care while incarcerated." (*Id*. at 666.) Further, "More than 800,000 inmates report having 1 or more chronic medical conditions, and their access to medical care appears to be poor, particularly in jails." (*Id*. at 669.) Distinguishing federal prisoners from state and local jail inmates, the report found, "Among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration." (*Id*.) Of more than 1 in 5 inmates taking a prescription medication before entering prison or jail, 26.3% of federal inmates stopped taking the medication upon incarceration. (*Id*.)

Hon. Kimba M. Wood
July 13, 2010
Page 6

      These articles may not provide an absolutely definitive description of the health care currently available in federal prisons. Nevertheless, within the time we have had to prepare this reply memorandum, we have not found any articles or studies suggesting that conditions have improved. Considering the conditions under which inmates are confined together, it seems obvious that Mr. Foster would be at greater risk of contracting a contagious respiratory ailment in prison than out, and that he would be at risk of not receiving adequate medical care. The danger for Mr. Foster, as compared to other prisoners, is that, for him, this could be fatal.

## **Conclusion**

      For the foregoing reasons, and those discussed in our original sentencing memorandum, we respectfully ask the Court to sentence Mr. Foster to an appropriate term of probation, with, if the Court finds it necessary, a period of home detention.

                                                Respectfully Submitted,

                                                /s/
                                                Jesse M. Siegel